### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GOOGLE LLC, | |
| *Plaintiff,* | Civil Action No.: |
| v. | |
| DOES 1–25, | |
| *Defendants.* | |

### GOOGLE LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR AN *EX PARTE* TEMPORARY RESTRAINING ORDER <u>AND ORDER TO SHOW CAUSE</u>

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 8

BACKGROUND ................................................................................................................... 9

ARGUMENT ...................................................................................................................... 16

I.      This Court Should Grant Google's Proposed Temporary Restraining Order and
        Order to Show Cause for a Preliminary Injunction. ......................................... 16

        A. Google and the Public Will Suffer Irreparable Harm Absent Relief. .......................... 17

        B. Google Is Likely to Succeed on the Merits. ................................................................. 18

        C. The Balance of Equities Decidedly Favors a Temporary Restraining Order. .............. 27

        D. The Public Interest Favors a Temporary Restraining Order. ....................................... 28

II.     The Temporary Restraining Order Must Be *Ex Parte*. ..................................... 28

III.    The Court Should Authorize Google to Serve Process by Alternative Means. ................ 30

IV.     The All Writs Act Authorizes the Court to Direct Cooperation by Third Parties. ........... 31

CONCLUSION .................................................................................................................... 33

# TABLE OF AUTHORITIES

## Cases

*1567 56th St., LLC v. Spitzer*,
  774 F. Supp. 3d 476 (E.D.N.Y. 2025) ................................................................................16

*3M Co. v. CovCare, Inc.*,
  537 F. Supp. 3d 385 (E.D.N.Y. 2021) ................................................................................20

*Am. Cyanamid Co. v. Campagna Per Le Farmacie in Italia, S.P.A.*,
  847 F.2d 53 (2d Cir. 1988) ................................................................................................12

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
  823 F.3d 51 (2d Cir. 2016) ................................................................................................13

*In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*,
  770 F.2d 328 (2d Cir. 1985) ..............................................................................................25

*Chegg, Inc. v. Doe*,
  2023 WL 7392290 (N.D. Cal. Nov. 7, 2023) ....................................................................25

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*,
  843 F.3d 48 (2d Cir. 2016) ................................................................................................13

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*,
  794 F.2d 38 (2d Cir. 1986) ................................................................................................10

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
  598 F.3d 30 (2d Cir. 2010) .....................................................................................9, 10, 11

*CME Grp. Inc. v. Nagovskiy*,
  2019 WL 13252902 (N.D. Ill. Mar. 7, 2019) ....................................................... 2, 10, 12, 21

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*,
  96 F.4th 351 (2d Cir. 2024) ................................................................................................2

*DeFalco v. Bernas*,
  244 F.3d 286 (2d Cir. 2001) .............................................................................14, 15, 16, 17

*Drobbin v. Nicolet Instrument Corp.*,
  631 F. Supp. 860 (S.D.N.Y. 1986) ....................................................................................11

*Elsevier, Inc. v. Siew Yee Chew*,
  287 F. Supp. 3d 374 (S.D.N.Y. 2018) ...........................................................................23–24

*Facebook, Inc. v. Fisher*,
  2009 WL 5095269 (N.D. Cal. Dec. 21, 2009) ..................................................................10

*Filipova v. Gezhong (7–21 Delivery)*,
  2025 WL 2831148 (S.D.N.Y. Oct. 6, 2025) ...................................................22

*FTC v. Verity Int'l, Ltd.*,
  2000 WL 1805688 (S.D.N.Y. Dec. 8, 2000) ..................................................20

*Google v. Does 1–25*,
  No. 25-cv-04503 (S.D.N.Y. July 1, 2025), ECF No. 18 ...................................2

*Google LLC v. Starovikov*,
  2021 WL 6754263 (S.D.N.Y. Dec. 16, 2021) ...................................................2

*Google LLC v. Starovikov, et al.*,
  No. 1:21-cv-10260 (S.D.N.Y. Dec. 7, 2021), ECF No. 8 .................................23

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters*,
  415 U.S. 423 (1974) .......................................................................................23

*Hinterberger v. Catholic Health Sys., Inc.*,
  536 F. App'x 14 (2d Cir. 2013) ......................................................................14

*Makekau v. Hawaii*,
  943 F.3d 1200 (9th Cir. 2019) ........................................................................24

*Marvici v. Roche Facilities Maint. LLC*,
  2021 WL 5323748 (S.D.N.Y. Oct. 6, 2021) ...................................................24

*Med. Marijuana, Inc. v. Horn*,
  604 U.S. 593 (2025)........................................................................................18

*Microsoft Corp. v. Does 1–2*,
  No. 17-cv-01224 (E.D. Va. Oct. 27, 2017), ECF No. 26.................................26

*Microsoft Corp. v. Does 1–27*,
  No.10-cv-00156 (E.D. Va. Feb. 22, 2010), ECF No. 13 .................................26

*Microsoft Corp. v. Does 1–18*,
  2014 WL 1338677 (E.D. Va. April 2, 2014) ..................................................24

*Microsoft Corp. v. Does 1–2*,
  2022 WL 18359421 (E.D. Va. Dec. 27, 2022), *R&R adopted*,
  2023 WL 289701 (E.D. Va. Jan. 18, 2023) .........................................2, 10, 19, 21

*Microsoft Corp. v. Does 1–2*,
  2024 WL 1708328 (E.D. Va. Jan. 10, 2024), *R&R adopted*, 2024 WL
  1708323 (E.D. Va. Jan. 30, 2024).................................................................20

*Microsoft Corp. v. John Does 1–2*,
　No. 24-cv-02719 (D.D.C. Sept. 25, 2024), ECF No. 12 ........................................26

*Microsoft Corp. v. Nady and Does 1–4*,
　No. 24-cv-02013 (E.D. Va. Nov. 13, 2024), ECF No. 16 ......................................26

*Mirashi v. Doe*,
　2025 WL 783353 (D.N.J. Mar. 12, 2025) ................................................................22

*Playtex Prods., LLC v. Munchkin, Inc.*,
　2016 WL 1276450 (S.D.N.Y. Mar. 29, 2016) .........................................................14

*Register.com, Inc. v. Verio, Inc.*,
　356 F.3d 393 (2d Cir. 2004) ....................................................................................10

*Rio Props., Inc. v. Rio Int'l Interlink*,
　284 F.3d 1007 (9th Cir. 2002) .................................................................................23

*Safe Streets All. v. Hickenlooper*,
　859 F.3d 865 (10th Cir. 2017) .................................................................................16

*Sapient Corp. v. Does 1–50*,
　2018 WL 8221301 (N.D. Cal. Mar. 27, 2018) ...................................................22, 24

*Sapient Corp. v. Okorie*,
　2019 WL 1983230 (N.D. Cal. Mar. 26, 2019) ...................................................12–13

*Saunders Ventures, Inc. v. Salem*,
　797 F. App'x 568 (2d Cir. 2019) .............................................................................20

*Schering Corp. v. Pfizer Inc.*,
　189 F.3d 218 (2d Cir. 1999) ....................................................................................13

*Sophos Ltd. v. Does 1–2*,
　2020 WL 4722425 (E.D. Va. May 1, 2020) ............................................................22

*Sprint Spectrum L.P. v. Mills*,
　283 F.3d 404 (2d Cir. 2002) ...............................................................................24–25

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*,
　120 F.4th 59 (2d Cir. 2024) ................................................................................14–15

*Strougo v. Barclays PLC*,
　194 F. Supp. 3d 230 (S.D.N.Y. 2016), *aff'd but criticized on other grounds by*
　875 F.3d 79 (2d Cir. 2017)........................................................................................9

*Suber v. VVP Servs.*,
　2021 WL 1101235 (S.D.N.Y. Mar. 23, 2021) .........................................................20

*Tracfone Wireless, Inc. v. Simply Wireless, Inc.*,
    229 F. Supp. 3d 1284 (S.D. Fla. 2017) ...................................................................19

*Two Hands IP LLC v. Two Hands Am., Inc.*,
    563 F. Supp. 3d 290 (S.D.N.Y. 2021)......................................................................11

*In re U.S. of Am. for an Ord. Authorizing an In-Progress Trace of Wire*
    *Commc'ns Over Tel. Facilities*,
    616 F.2d 1122 (9th Cir. 1980) .................................................................................26

*United Spinal Ass'n v. Bd. of Elections in City of N.Y.*,
    2017 WL 8683672 (S.D.N.Y. Oct. 11, 2017), *R&R adopted*,
    2018 WL 1582231 (Mar. 27, 2018)..........................................................................25

*United States v. Aulicino*,
    44 F.3d 1102 (2d Cir. 1995)......................................................................................17

*United States v. Errico*,
    635 F.2d 152 (2d Cir. 1980)......................................................................................16

*United States v. N.Y. Tel. Co.*,
    434 U.S. 159 (1977)......................................................................................24, 25, 26

*United States v. Turkette*,
    452 U.S. 576 (1981)..................................................................................................16

*United States v. Valle*,
    807 F.3d 508 (2d Cir. 2015)......................................................................................19

*Victorinox AG v. B&F Sys., Inc.*,
    114 F. Supp. 3d 132 (S.D.N.Y. 2015)......................................................................13

*Virgin Enters. Ltd. v. Nawab*,
    335 F.3d 141 (2d Cir. 2003)......................................................................................12

*In re Vuitton et Fils S.A.*,
    606 F.2d 1 (2d Cir. 1979) (per curiam).....................................................................21

*Weaver v. Schiavo*,
    750 F. App'x 59 (2d Cir. 2019) ..................................................................................9

*Yahoo! Inc. v. XYZ Cos.*,
    872 F. Supp. 2d 300 (S.D.N.Y. 2011)......................................................................13

## **Statutes**

15 U.S.C. § 1114.................................................................................................................12, 13

15 U.S.C. § 1116........................................................................................................................11

15 U.S.C. § 1125 ..................................................................................................13

18 U.S.C. § 1029 ..................................................................................................19

18 U.S.C. § 1030 ..............................................................................................19–20

18 U.S.C. § 1343 ..................................................................................................17

18 U.S.C. § 1961 ..................................................................................................17

18 U.S.C. § 1962 ..................................................................................................19

18 U.S.C. § 1964 ..................................................................................................18

28 U.S.C. § 1651 ..................................................................................................24

**<u>Rules</u>**

Fed. R. Civ. P. 4(f)(3) ......................................................................................23, 24

Fed. R. Civ. P. 65(b)(l) ...........................................................................................21

# INTRODUCTION

This is an application for an emergency *ex parte* temporary restraining order to disrupt a global criminal enterprise that has stolen financial information and login credentials from over a million victims already and exploited the trust and goodwill associated with the Google brand. Using novel software designed to facilitate large-scale "phishing" attacks,[1] Defendants lure unsuspecting victims into entering their credit card information and other credentials on websites designed to mimic legitimate websites (such as those of the United States Postal Service), and that often prominently feature unauthorized use of Google logos.

The software—called Lighthouse—was built and is marketed by members of a criminal enterprise (the "Lighthouse Enterprise" or "Enterprise") as a powerful phishing tool; a "phishing for dummies" kit designed to facilitate every aspect of a phishing cyberattack for cybercriminals who could not otherwise execute large-scale phishing campaigns.

Enterprise members coordinate with each other to identify victims, "phish" using deceptive text messages and ads, build fraudulent websites, steal victims' sensitive financial information and login credentials, and use that information in connection with other criminal schemes, ranging from pump-and-dump stock fraud to stealing funds directly from victims' bank accounts.[2]

Because Lighthouse makes phishing so easy, the scale of the attacks has been staggering. The Lighthouse Enterprise has already harmed over one million victims globally, including in the Southern District of New York, and, without the relief Google seeks here, will continue to harm Google, its users, and the public. This Court should grant Google's motion and issue the proposed temporary restraining order and order to show cause for a preliminary injunction. The injunction

---

[1] A "phishing" attack is a form of cyberattack that dupes victims into clicking on malicious links, often with false messages about a lost package or unpaid toll.

[2] Naxo Decl. ¶¶ 20–21, 27, 31–35, 100.

is necessary for Google to carry out its disruption plan to disable the domains and servers used by the Enterprise, and Google's disruption may be the first of several attempts to permanently disable servers and domains as the Enterprise changes its infrastructure in response to Google's disruption. This Court and others have authorized injunctions to disrupt similar cybercriminal enterprises.[3] These steps will disrupt the Enterprise's fraudulent schemes and impede further criminal activity by preventing the Enterprise from reaching additional victims.

Google's application establishes the factors necessary to obtain a temporary restraining order and a preliminary injunction: irreparable harm, a likelihood of success on the merits, the balance of equities tipping in its favor, and that the requested relief is in the public interest. *See Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024).

To prevent irreparable harm, relief must be *ex parte*. First, the harm is ongoing, as the Enterprise exploits and expands its phishing operation with every passing day. Second, notice would give the Enterprise the opportunity to circumvent Google's plans to disrupt the execution of the Enterprise's ongoing schemes. If this Court grants preliminary relief, Google will provide the Enterprise with notice five days before a hearing on a preliminary injunction or within such time as the Court may order, through service as requested in this motion.

## BACKGROUND

Defendants Does 1–25, who collectively comprise the Lighthouse Enterprise, are cybercriminals and co-conspirators who operate a well-known phishing ring using a set of software

---

[3] *See, e.g.*, *Microsoft Corp. v. Does 1–2*, 2022 WL 18359421, at *4 (E.D. Va. Dec. 27, 2022), *R&R adopted*, 2023 WL 289701 (E.D. Va. Jan. 18, 2023); *CME Grp. Inc. v. Nagovskiy*, 2019 WL 13252902, at *2 (N.D. Ill. Mar. 7, 2019); *Google LLC v. Starovikov*, 2021 WL 6754263, at *1 (S.D.N.Y. Dec. 16, 2021); *Google v. Does 1–25*, No. 25-cv-04503, ECF No. 18 (S.D.N.Y. July 1, 2025).

tools known as "Lighthouse." Plaintiff Google's Complaint ("Compl.") ¶¶ 4–5; Declaration of ███████████ ("Naxo Declaration" or "Naxo Decl.") ¶¶ 6, 20–23. Members of the Enterprise license the software and coordinate with each other using dedicated Telegram and YouTube channels. Naxo Decl. ¶¶ 25–27, 98–123. Some of the Enterprise's most notorious schemes include: (1) text phishing scams mimicking messages from the United States Postal Service ("USPS"), E-ZPass, the New York City government, and large financial services companies and (2) e-commerce website scams that use fraudulent ads to funnel targets to shopping websites that trick targets into purchasing "discounted" products like cups and toys. Naxo Decl. ¶¶ 24–33. Many of these scams feature an unauthorized use of Google logos and encourage targets to log in using Gmail credentials, tricking them into turning over sensitive personal information. Compl. ¶¶ 111–15; Declaration of ███████████ ("Google Decl.") ¶ 27. Google has devoted and continues to devote substantial financial resources to investigate the use of Lighthouse, to develop measures to identify and prevent phishing attacks on its platforms, and to remediate harm caused by the Lighthouse Enterprise. Compl. ¶ 121; Google Decl. ¶¶ 41–42.

### A.    Lighthouse

A "phishing" scheme is a cyberattack that dupes targets into revealing sensitive information through deceptive emails, text messages, or websites. Compl. ¶¶ 24–27; Naxo Decl. ¶ 9. These schemes have been enormously lucrative, as has licensing the infrastructure necessary to execute them. Phishing-as-a-Service ("PhaaS") is a business model premised on the sale of software and support services that facilitate phishing, making it relatively easy for those without technical expertise to execute a phishing campaign. Compl. ¶¶ 28–30; Naxo Decl. ¶¶ 10, 21.

The Lighthouse software is one example. The Enterprise created Lighthouse to make phishing quick, easy, and effective—it is a prepackaged suite of all the software tools needed to

run a phishing campaign, including over 600 templates for fake websites spoofing well-known businesses, as well as a platform to collect and organize stolen personal and financial information. Compl. ¶¶ 33, 83; Naxo Decl. ¶¶ 30, 68–69. The templates allow the Enterprise to create fake websites mimicking the websites of real entities where victims enter their sensitive information. Naxo Decl. ¶¶ 21–23. A central feature of Lighthouse is its keystroke logging capability, which opens a window to a victim's phone or device when a victim accesses one of the fake websites, enabling the Enterprise to observe the entry of victims' information in real time. Naxo Decl. ¶ 80.

There are two versions of the Lighthouse software: the SMS version and the e-commerce version. Naxo Decl. ¶¶ 24–33. The SMS version enables scammers to distribute mass text messages to thousands of targets, directing them to fake websites—which often feature Google Marks—that are created from templates that are also provided by Lighthouse. Naxo Decl. ¶¶ 24–30. The e-commerce version allows threat actors to create their own fraudulent websites to steal victims' financial information and then target those victims by publishing ads that direct the victims to their website. Naxo Decl. ¶¶ 31–33. The software can be licensed on a weekly, monthly, seasonal, annual, or permanent basis. Naxo Decl. ¶¶ 121–22.

### B.    The Lighthouse Enterprise

The precise identities of the individuals participating in the Lighthouse Enterprise are unknown. Naxo Decl. ¶ 7. But Google, NAXO, and other cybersecurity experts investigating the Enterprise have identified at least five interconnected threat groups that manage and participate in the Enterprise. Compl. ¶¶ 47–73; Naxo Decl. ¶¶ 21, 98–113. These threat groups develop and use Lighthouse to carry out the Enterprise's schemes and depend on each other's specialties to execute the phishing schemes—some of the members may even play multiple roles in the schemes. Compl. ¶ 47; Naxo Decl. ¶¶ 7, 21, 101. The Developer Group creates the phishing software and templates

11

and maintains and updates the software. Compl. ¶¶ 49–51; Naxo Decl. ¶¶ 21, 35. The Data Broker Group supplies lists of potential victims' contact information. Compl. ¶¶ 52–54; Naxo Decl. ¶ 21. The Spammer Group provides the tools to send out mass text messages, often operating farms of numerous cell phones. Compl. ¶¶ 55–56; Naxo Decl. ¶ 21. The Theft Group monetizes the stolen information acquired by other members of the Enterprise, to help steal money, social security information, and additional victim information. Compl. ¶¶ 57–60; Naxo Decl. ¶ 21. And finally, the Administrative Group connects all the members of the Enterprise together by managing the online Telegram and YouTube communities where Lighthouse is sold and the Enterprise coordinates specific schemes. Compl. ¶¶ 61–73; Naxo Decl. ¶¶ 21, 100–13. Acting together, the threat actor groups develop and execute the Enterprise's numerous criminal phishing schemes. Compl. ¶ 73; Naxo Decl. ¶¶ 7, 34, 125.

### C.    The Lighthouse Enterprise's Criminal Schemes

The Enterprise uses both the SMS and e-commerce versions of the Lighthouse software to carry out numerous criminal phishing scams. Four of the most well-known of those scams include the Delivery Scheme, the Toll Scheme, the Financial Institutions Scheme, and the E-Commerce Scheme (collectively, the "Lighthouse Schemes"). Compl. ¶¶ 74–107; Naxo Decl. ¶¶ 24–34. Many of these fraudulently use Google's logos and branding on spoofed websites to bolster their legitimacy. Compl. ¶¶ 111–20; Google Decl. ¶¶ 25–29. Some of these spoofed websites encourage targets to login with their Gmail credentials or publish fraudulent ads through Google Ads. Compl. ¶¶ 112, 120; Google Decl. ¶¶ 25, 32–37.

***Delivery Scheme.*** In this phishing scam, the Enterprise sends a text message—purportedly from USPS, for example—telling the targets that they have an undelivered package. Compl. ¶¶ 75–84; Naxo Decl. ¶¶ 24–26. To "complete delivery," the text tells targets that they must pay a small

delivery fee by clicking on the website link provided, which directs them to a spoofed USPS website. Compl. ¶ 80; Naxo Decl. ¶ 24. Once on the website, targets are prompted to enter their personal identifying and financial information. Compl. ¶¶ 80–81; Naxo Decl. ¶ 24. As they enter their information, Lighthouse simultaneously tracks their keystrokes; the targets need not even submit the payment for the Enterprise to acquire their information. Compl. ¶¶ 82–83; Naxo Decl. ¶¶ 23–25.

*Toll Scheme.* The Enterprise's Toll Scheme works much the same way as the Delivery Scheme; the text indicates that the target has a past due toll violation and directs the target to pay the purported toll. Compl. ¶¶ 86–92; Naxo Decl. ¶¶ 25–26. The text directs targets to spoofed websites such as the New York City government's website and E-ZPass New York's website to enter their personal financial information. Compl. ¶¶ 89–90; Naxo Decl. ¶¶ 27–28. The Lighthouse websites are nearly indistinguishable from the legitimate websites they mimic. Compl. ¶¶ 88–89; Naxo Decl. ¶¶ 25–26.

*Financial Institutions Scheme.* The Enterprise's Financial Institutions Scheme targets even more damaging personal information. Compl. ¶¶ 93–97; Naxo Decl. ¶ 105. In this scheme, the Enterprise spoofs login pages of well-known financial and brokerage institutions. Compl. ¶¶ 93–94; Naxo Decl. ¶¶ 27–28, 105–06. The text directs targets to the login page of the financial institution on a mobile web browser. Compl. ¶¶ 93–94; Naxo Decl. ¶¶ 27–28. As targets begin to input their login credentials, Lighthouse again records the information in real time. Compl. ¶ 96; Naxo Decl. ¶¶ 24, 33, 79. The Enterprise is then able to access targets' financial accounts, including their investments, retirement savings, bank accounts, and more. Compl. ¶ 58; Naxo Decl. ¶¶ 20–21.

*E-Commerce Scheme.* Finally, Lighthouse's e-commerce software provides the templates for its E-Commerce Scheme. Compl. ¶¶ 97–107; Naxo Decl. ¶¶ 31–32. Using Lighthouse, the Enterprise builds fake shopping websites that profess to sell brand-name items such as toys or drinkware. Compl. ¶¶ 105(a)–(d); Naxo Decl. ¶¶ 12, 31–32. The Enterprise then uses online advertising platforms to create fraudulent ads that direct targets to the websites. Compl. ¶¶ 99–102; Google Decl. ¶¶ 32–33. In some instances, members of the Enterprise use false contact information and Gmail accounts set up specifically for criminal use to create Google Ads accounts using stolen credit card information. Compl. ¶¶ 100, 105; Google Decl. ¶¶ 34–36. The Enterprise then deploys the fake ads on social media or other web browsers. Compl. ¶ 101; Google Decl. ¶ 32.

After a target clicks on the fake ad, they are directed to one of the Enterprise's fake websites, where they can purchase a (non-existent) item. Compl. ¶¶ 102–03; Google Decl. ¶¶ 33(a)–(d). Many of the websites claim that different types of payments are "accepted," including: "debit and credit card payments in 135+ currencies, as well as Apple Pay, Google Pay, Klarna, Affirm, P24, ACH, and more." Compl. ¶ 104; Naxo Decl. ¶ 32. If the targets "complete" a purchase, they receive a tracking or confirmation number and are directed to a spoofed confirmation page. Compl. ¶ 102; Naxo Decl. ¶ 80 & n.50. Victims, of course, never receive their orders, and the Enterprise steals their money as well as their personal and financial information. Compl. ¶¶ 101–03; Naxo Decl. ¶ 79 & n.47.

### D.    Lighthouse Harms Google and the Public

The Lighthouse Enterprise harms victims of the attack, spoofed businesses, Google, and numerous others. Compl. ¶¶ 108–21; Google Decl. ¶¶ 38–44. The Lighthouse Enterprise steals phishing victims' money and personal information. Compl. ¶ 108; Google Decl. ¶¶ 38–39. The

Enterprise also harms Google and other businesses whose logos or websites have been spoofed by damaging customer trust and goodwill. Compl. ¶¶ 110–17; Google Decl. ¶¶ 40–41. Specifically, the Enterprise has created and deployed at least 116 spoofed website templates featuring Google's branding or logos (YouTube, Gmail, Google, or Google Play) on the sign-in screen. Compl. ¶¶ 111–14; Naxo Decl. ¶ 53. Victims may view the presence of Google logos as an indicator that the website is safe or legitimate. Compl. ¶ 115; Google Decl. ¶ 31. The Enterprise is thus using Google branding—and the goodwill associated with it—to convince victims to turn over their sensitive financial data. Compl. ¶ 115; Google Decl. ¶ 31. Google has also been damaged by the use of Google Ads to publish fraudulent ads. Compl. ¶ 119; Google Decl. ¶ 41. Google has devoted (and continues to devote) substantial financial resources to investigate the Lighthouse Schemes, to develop measures to identify and prevent phishing attacks on its platforms, and to remediate the harms caused by the Enterprise. Compl. ¶ 121; Google Decl. ¶ 42. Despite these efforts, Google has been unable to identify Defendants due to their use of aliases and dummy accounts. Compl. ¶ 16; Google Decl. ¶ 37.

The Enterprise's widespread phishing attacks targeting victims and institutions across multiple industries show that it is a sophisticated group with significant capabilities and reach. Compl. ¶¶ 22, 47; Naxo Decl. ¶ 125. Because Lighthouse makes phishing so easy, it is capable of causing staggering harm. Compl. ¶ 62; Naxo Decl. ¶¶ 10, 21; Google Decl. ¶ 19. Over a 20-day period, approximately 200,000 fraudulent websites created with Lighthouse were used to attract "well over 1,000,000 potential victims" in over 121 countries. Compl. ¶ 6; Naxo Decl. ¶ 23. Lighthouse-supported phishing websites received an average of 50,000 page visits per day. Compl. ¶ 6; Naxo Decl. ¶ 23.

The Enterprise's Delivery Scheme, for example, is among the most prolific cyberattacks currently in operation—from July 2023 through October 2024 it compromised somewhere between 12.7 million and 115 million credit cards in the United States alone. Compl. ¶ 6; Naxo Decl. ¶ 23. As long as the Enterprise continues to operate unchecked, the threat it represents grows. Compl. ¶¶ 6, 20, 129; Google Decl. ¶ 5. Google has invested significant resources to identify activity related to Lighthouse on its own platforms and has taken action to stop the impact of that activity. Google Decl. ¶¶ 41–42. But until Lighthouse is disrupted, the Enterprise will continue to operate unchecked and generate revenue that it can reinvest in other nefarious criminal activities. Compl. ¶¶ 30, 57–60. With the ability to steal millions of credentials each year, phishing schemes like the Lighthouse Schemes have become the ATMs of the criminal underworld. Compl. ¶ 30.

## ARGUMENT

**I.    This Court Should Grant Google's Proposed Temporary Restraining Order and Order to Show Cause for a Preliminary Injunction.**

A plaintiff is entitled to a temporary restraining order and preliminary injunction where (1) it "is likely to suffer irreparable harm in the absence of" relief; (2) it is "likely to succeed on the merits" (or at least raises "sufficiently serious questions"); (3) the "balance of equities tips in [its] favor" (and "decidedly" so, if the second factor is satisfied by sufficiently serious questions); and (4) "an injunction is in the public interest." *See Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34–35 (2d Cir. 2010).

Courts balance the factors to grant preliminary relief "like a sliding scale, such that more of one excuses less of the other." *Strougo v. Barclays PLC*, 194 F. Supp. 3d 230, 233 (S.D.N.Y. 2016) (internal citations and quote marks omitted), *aff'd but criticized on other grounds by* 875 F.3d 79 (2d. Cir. 2017). That said, "[i]rreparable harm is the single most important prerequisite for relief." *Weaver v. Schiavo*, 750 F. App'x 59, 60 (2d Cir. 2019) (internal quotations omitted). Here,

all of the injunction factors weigh in Google's favor. Furthermore, given the grave threat of irreparable harm, this Court may grant Google relief if it concludes that Google's claims raise "serious question[s] going to the merits to make them a fair ground for trial." *Citigroup*, 598 F.3d at 33 (internal quotations omitted). Courts have granted preliminary relief in cases where, as here, the defendants include unknown persons or entities operating a phishing scheme to harm the plaintiff and the public. *See, e.g.*, *CME Grp. Inc.*, 2019 WL 13252902, at *2; *Facebook, Inc. v. Fisher*, 2009 WL 5095269, at *1 (N.D. Cal. Dec. 21, 2009) (granting TRO where defendants operated a phishing scheme to steal login credentials); *Microsoft Corp. v. Does 1–2*, 2022 WL 18359421, at *4 (E.D. Va. Dec. 27, 2022).

This case is a quintessential candidate for emergency relief. The Enterprise is causing ongoing and irreparable harm to Google and the public. It is using phishing attacks to steal personal and financial information, defrauding unsuspecting targets, impairing Google's reputation and goodwill, and causing Google (and numerous others) unrecoverable financial losses. Until the Lighthouse Schemes are disrupted, the Enterprise will continue to profit from its unlawful activities at the expense of Google and an ever-increasing number of victims.

A.    **Google and the Public Will Suffer Irreparable Harm Absent Relief.**

The Enterprise's misconduct creates consumer confusion in the marketplace, tarnishes Google's trademarks, injures Google's goodwill, and damages its reputation by falsely associating Google with the Lighthouse Schemes. Compl. ¶¶ 110–20; Google Decl. ¶¶ 21–31, 40–43. It is well-established that a "company's loss of reputation, good will, and business opportunities" constitutes irreparable harm. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *accord Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986). Here, Google has invested significant resources to develop strong brand recognition associated with its name, logos, and products. Compl. ¶¶ 11–14; Google Decl. ¶¶ 6–

8. Google's harm is further compounded by the substantial financial resources Google has devoted and continues to devote to combat the Lighthouse Schemes. Compl. ¶ 121; Google Decl. ¶ 42.

The irreparable harm to Google is especially clear here given the doubt that it will ever be made whole—even after final judgment—because the Enterprise consists of elusive cybercriminals who likely will take steps to avoid complying with any judgment. *See, e.g.*, *Drobbin v. Nicolet Instrument Corp.*, 631 F. Supp. 860, 912 (S.D.N.Y. 1986) ("Where a plaintiff's injury is theoretically compensable in money damages but, as a practical matter, the defendant would not or could not respond fully for those damages, preliminary injunctive relief has been deemed necessary to protect the plaintiff from irreparable injury."). Moreover, Google is "entitled to a presumption of irreparable harm" upon showing, as Google does here, a likelihood of success on its claims under the Lanham Act. *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 300 (S.D.N.Y. 2021); 15 U.S.C. § 1116(a).

### B.    Google Is Likely to Succeed on the Merits.

Google need only show that it is "likely to succeed" or that there are sufficiently "serious questions going to the merits to make them a fair ground for litigation." *Citigroup*, 598 F.3d at 34–35 (internal quotations omitted). Google not only raises serious questions going to the merits, but it is likely to succeed on each claim. It has supported its motion with declarations from an investigator in Google's CyberCrime Investigation Group and from NAXO, an investigations and digital forensics firm. Each declaration details substantial evidence of Defendants' misconduct and the irreparable harm they have caused to Google and the public. Given the strength of this evidence, the likelihood of success weighs heavily in favor of granting relief.

### (i)    Google Is Likely to Succeed on its Lanham Act Claims.

Google has established that Defendants' unauthorized use of Google branding violates the Lanham Act's prohibitions on trademark and service mark infringement as well as its related

prohibitions on false endorsement and sponsorship, false designation of origin, false advertising, and unfair competition.

Section 1114 of the Lanham Act prohibits infringement of a registered trademark or service mark. Infringement occurs when any person, without the consent of the registrant, "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services" and "such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). A plaintiff need only show that (1) it has a valid, protectable mark and (2) defendants' use of that mark in commerce is likely to cause confusion among consumers. *See Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003). "In trademark cases, a showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm. To meet this burden, [the plaintiff] need[s] only to raise a serious question of likelihood of confusion." *Am. Cyanamid Co. v. Campagna Per Le Farmacie in Italia, S.P.A.*, 847 F.2d 53, 55 (2d Cir. 1988) (cleaned up).

Defendants' liability under these provisions is straightforward. Google has valid, protectable rights to the Marks, with relevant, incontestable registrations. *See* Google Decl. ¶ 29 (detailing Google's registered Marks). Defendants appropriate those Marks to deceive the public, which has likely caused confusion and mistake. *See, e.g.*, *CME Grp. Inc.*, 2019 WL 13252902, at *1–2 (finding a "likelihood of confusion" where defendants perpetrated a phishing scheme using plaintiff's marks). Indeed, confusion is the point: Defendants exploit Google's trustworthy and well-known designs on their spoofed websites to trick their targets into falling for their scams. Such schemes are paradigmatic Lanham Act violations. *See, e.g.*, *id.* (finding Lanham Act liability where defendants used plaintiff's marks "in connection with a phishing scheme designed to solicit

or request personally identifiable information"); *Sapient Corp. v. Okorie*, 2019 WL 1983230, at *2 (N.D. Cal. Mar. 26, 2019) (similar).[4]

Additionally, section 1125(a) prohibits "false designations of origin" that are likely to cause confusion as to the "origin, sponsorship, or approval" of a product or service. 15 U.S.C. § 1125(a)(1)(A). A claim under section 1125(a)(1)(A) has the same elements as a claim under section 1114(1) and can be established with the same evidence, *see Victorinox AG v. B&F Sys., Inc.*, 114 F. Supp. 3d 132, 139 (S.D.N.Y. 2015), so Google's section 1125(a)(1)(A) claim is likely to succeed for the same reasons.

Section 1125(a) also prohibits false advertising. 15 U.S.C. § 1125(a)(1)(B). To qualify as false advertising, a representation must be (1) false, (2) material, (3) placed in interstate commerce, and (4) have caused injury to the plaintiff. *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016). False advertising claims thus contain two key components. "First (and obviously), a plaintiff bringing a false advertising claim must show falsity," either by demonstrating a challenged advertisement is false on its face or that the advertisement, "while not literally false, is nevertheless likely to mislead or confuse consumers." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016) (internal quotation and citation omitted). Second, a plaintiff "'must also demonstrate that the false or misleading representation involved an inherent or material quality of the product.'" *Id.* (quoting *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 n.3 (2d Cir. 1999)). "When an advertisement is false on its face or false by necessary implication, a court may grant relief 'without reference to

---

[4] *See also, e.g.*, *Yahoo! Inc. v. XYZ Cos.*, 872 F. Supp. 2d 300, 304 (S.D.N.Y. 2011) (upholding claim for trademark infringement where defendants intentionally copied plaintiff's name and marks in emails designed to mislead victims into thinking they won lotteries affiliated with plaintiff).

the advertisement's actual impact on the buying public' because consumer confusion is presumed."
*Playtex Prods., LLC v. Munchkin, Inc.*, 2016 WL 1276450, at *4 (S.D.N.Y. Mar. 29, 2016)
(quoting *Time Warner Cable, Inc. v. DirectTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007)).

Here, Defendants deceive internet users by featuring Google Marks on their spoofed
websites, falsely marketing their scam as bearing Google's approval or involvement. That
fraudulent marketing scheme easily satisfies the elements of false advertising. The representations
are literally false because the spoofed websites are not from or endorsed by Google and the use of
the Google Marks in connection with the fraudulent schemes violates Google's Terms of Service.
Compl. ¶¶ 118–20; Google Decl. ¶¶ 30, 36. And the representations are material because they are
critical to the success of the phishing operation. The only reason Defendants' schemes are
successful is because their websites appear to be real—they bear the marks of trusted institutions
and brands like Google and YouTube. The messages using Google Marks are placed in interstate
commerce on the internet. And the messages have caused injury to Google by damaging its hard-
earned goodwill, tarnishing its Marks by association with fraud, and forcing it to spend substantial
resources to combat the scams and protect its Marks. Defendants have thus violated the Lanham
Act in multiple ways, many times over. For all of these reasons, Google's Lanham Act claims are
likely to succeed on the merits.

### (ii)    Google Is Likely to Succeed on Its RICO Claim.

Google is likely to prevail on its claims under RICO. To prove a RICO claim, a plaintiff
must establish that the defendant engaged in "(1) conduct (2) of an enterprise (3) through a pattern
(4) of racketeering activity." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) (cleaned up).
The defendant also must have engaged in "interstate or foreign commerce" in carrying out these
acts. *See Hinterberger v. Catholic Health Sys., Inc.*, 536 F. App'x 14, 16 (2d Cir. 2013). And the
defendant must have caused "an injury to business or property." *DeFalco*, 244 F.3d at 305. A

private plaintiff is entitled to equitable relief when it demonstrates injury under RICO. *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 95 (2d Cir. 2024).

Google satisfies each of the required elements of a RICO claim. The Lighthouse Enterprise is a digital incarnation of organized crime, and it carries out its illicit activities not only in New York, but across the country and around the world. Defendants share a common purpose of defrauding victims into disclosing sensitive personal information, including details for financial accounts, and stealing their money. United by the Lighthouse software and social media infrastructure, the Enterprise quickly and easily coordinates sophisticated phishing schemes. Google has suffered injury to its business or property because of the Enterprise's racketeering activity.

1.      **Conduct.** To satisfy the conduct element, a plaintiff must establish that the defendants had "some part in directing [the enterprise's] affairs." *DeFalco*, 244 F.3d at 309 (cleaned up). This standard is "not limited to those with primary responsibility," nor is it limited to those "with a formal position in the enterprise." *Id.* (internal quotations omitted). Here, each Defendant had at least "some part" in the Enterprise. *Id.*; *see* Compl. ¶¶ 47–73, 127–29; Naxo Decl. ¶¶ 21, 34, 125. Members of the Enterprise all take part in directing the aspects of the scheme: some develop the PhaaS software, architecture, and user interface; others create and manage an online community that recruits new members of the Enterprise and facilitates constant communication; others supply lists of potential victims' contact information; others specialize in strategies for sending out SMS messages; and yet others steal more of a victim's information and money after the Enterprise acquires phished credentials. *See* Compl. ¶¶ 47, 73; Naxo Decl. ¶ 21. The Enterprise works together to implement its schemes; none of the schemes can generate revenue without the Enterprise members' cooperation. *See* Compl. ¶ 47; Naxo Decl. ¶¶ 21, 113, 125.

2.      **Enterprise.** To show that the defendants participated in and operated as an enterprise, a plaintiff must establish (1) "a common purpose of engaging in a course of conduct"; (2) "an ongoing organization, formal or informal"; and (3) "evidence that the various associates function as a continuing unit." *DeFalco*, 244 F.3d at 307 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). The Enterprise members' common purpose is clear: use Lighthouse and leverage connections over social media to enrich themselves by executing a wide variety of coordinated phishing schemes. Compl. ¶¶ 127–31; Naxo Decl. ¶¶ 21–32. Defendants play interdependent roles, with the Enterprise "rel[ying] on the actions of each of the Defendants to execute its fraudulent scheme." *1567 56th St., LLC v. Spitzer*, 774 F. Supp. 3d 476, 490 (E.D.N.Y. 2025). Using Lighthouse, Defendants can choose from over 600 templates (courtesy of the Developer Group) to set up fraudulent phishing websites that are designed to appear identical to legitimate websites. Compl. ¶ 33; Naxo Decl. ¶ 30. They can then turn to the Telegram channel (operated by the Administrative Group) to coordinate phishing activities across the Data Broker, Spammer, and Theft Groups. Compl. ¶¶ 61–63, 65–73; Naxo Decl. ¶¶ 95–112. Any lingering questions about Lighthouse could be answered by navigating to the YouTube channel, which the Administrative Group used to disseminate information in furtherance of the Lighthouse Schemes (before Google suspended the channel). Compl. ¶ 64; Google Decl. ¶ 22. Through Lighthouse and the accompanying online community, Defendants "pool[] their resources, knowledge, skills, and labor to achieve through th[at] enterprise efficiencies ... that none of them could have achieved individually." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 883 (10th Cir. 2017). The Enterprise Defendants thus function as a unit. *See United States v. Errico*, 635 F.2d 152, 156 (2d Cir. 1980) (affirming finding of RICO enterprise where a "network of jockeys and bettors" "came together" to "profit from the illegal fixing of races"). Google has provided strong evidence establishing that

23

the Enterprise is a group of persons associated together, as a continuing unit, for the common purpose of carrying out criminal activities.

      **3.**      **Pattern.** To show a "pattern" of racketeering activity under RICO, a plaintiff must establish "at least two acts of racketeering activity, one of which occurred [after 1970] and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." *DeFalco*, 244 F.3d at 306 (quoting 18 U.S.C. § 1961(5)). The racketeering activity must exhibit "continuity" over time. *United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995). Continuity is especially easy to demonstrate where the aims of the enterprise are inherently unlawful. *Id*. Google has presented numerous examples of the Enterprise's recent criminal conduct that clearly form a "pattern" within the meaning of the statute. Compl. ¶¶ 74–104, 105(a)–(d), 106(a)–(d); Google Decl. ¶¶ 33(a)–(d), 34(a)–(d). Indeed, Lighthouse-supported phishing websites receive an average of 50,000 page visits per day, according to recent estimates. Compl. ¶ 108; Naxo Decl. ¶ 23. And there can be no doubt that the aims of the Enterprise—to perpetrate phishing schemes—are inherently unlawful.

      **4.**      **Predicate Acts.** To show that a defendant engaged in racketeering activity, a plaintiff must establish that the defendant committed one or more of the predicate acts enumerated in 18 U.S.C. § 1961(1). *See DeFalco*, 244 F.3d at 306. The predicate acts include violations of the federal wire fraud statute.

      The Enterprise committed wire fraud by "transmitt[ing], by means of wire … communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing [fraudulent] scheme[s]." 18 U.S.C. § 1343. The Enterprise commits wire fraud in violation of 18 U.S.C. § 1343 each time that it (1) uses online advertising platforms to distribute links to websites purporting to be legitimate e-commerce sites designed to trick the

owner of a device into unknowingly submitting sensitive personal or financial information; (2) creates Gmail accounts and Google Ads accounts using fake names and stolen credit card information to deploy fake ads impersonating legitimate brands; and (3) sends text messages containing links to websites falsely purporting to be government agencies, financial institutions, and other legitimate brands to trick the target into unknowingly submitting sensitive personal or financial information. Compl. ¶¶ 75–95, 99–102, 105–07; Google Decl. ¶¶ 32–36; Naxo Decl. ¶¶ 24–30.

5.    **Injury to Google's Business and Property.** Defendants' RICO violations have directly caused Google injury to its business and property. "A plaintiff has been 'injured in his business or property' if his business or property has been harmed or damaged. Section 1964(c) requires nothing more." *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 601 (2025); *see also id.* (construing "injure" in Section 1964(c) to have its "ordinary meaning," which encompasses "damage of or to ... reputation" (cleaned up)). The injury to Google's business is an inherent component—and is the direct result—of the Lighthouse Schemes. In part by using fake names and stolen credit cards to create fraudulent Gmail and Google Ads accounts, the scam dupes its victims into turning over their sensitive information by mimicking trusted brands, government agencies, and financial institutions, relying on Google Marks to prey on consumer trust. Google must respond to remediate the business impact of the Scheme. It has been forced to spend time (hundreds of hours) and money investigating the Scheme, identifying and suspending compromised Gmail and Google Ads accounts, and pursuing other mitigation efforts. Defendants' RICO violations have injured Google's business or property.

### (iii) Google Is Also Likely to Succeed on Its RICO Conspiracy Theory.

In addition to establishing a substantive RICO violation, Google can demonstrate that the Enterprise engaged in a RICO conspiracy. To establish that claim, Google need only prove that the Enterprise "conspire[d] to violate" the provisions of 18 U.S.C. § 1962(d). The overlapping links among the Defendants—including the use of the Lighthouse software, the chats from the Telegram group, and the methods used to deploy sophisticated and widespread schemes—indicate that the Enterprise formed an agreement to undertake the acts described above as part of a common scheme and conspiracy. Compl. ¶¶ 47–73; Naxo Decl. ¶¶ 24–34, 98–112. Because they agreed to form and operate the Enterprise and to commit the numerous predicate acts of fraud and related activity that make up the criminal activity facilitated by the Scheme, Defendants are liable under 18 U.S.C. § 1962(c).

### (iv) Google Is Likely to Succeed on its CFAA Claims.

Congress enacted the CFAA to combat computer-related crimes, particularly "hacking or trespassing into computer systems or data." *United States v. Valle*, 807 F.3d 508, 525 (2d Cir. 2015) (internal quotations omitted). The Enterprise's phishing attacks are "precisely the type of activity that the CFAA is designed to prevent," and consequently Courts routinely grant injunctive relief. *See, e.g.*, *Microsoft Corp. v. Does 1–2*, 2022 WL 18359421, at *4.

The evidence shows that the Enterprise has "knowingly and with intent to defraud traffic[ked] … password[s]" through Telegram channels and other online forums. 18 U.S.C. § 1030(a)(6); *Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 229 F. Supp. 3d 1284, 1297 (S.D. Fla. 2017) (plaintiff stated claim under § 1030(a)(6) where trafficking occurred over the internet and a telecommunications network). To "traffic" a password means to "transfer" it. 18 U.S.C. § 1029(e)(5) ("[T]raffic means transfer, or otherwise dispose of, to another, or obtain control of

with intent to transfer or dispose of" the password). After procuring phished credentials (including passwords) by impersonating other entities, the Enterprise transfers or sells those credentials to each other or other cybercriminals. Compl. ¶¶ 57–60, 73.

Google has shown loss exceeding $5,000 to multiple persons within the course of a year, including the costs Google incurred responding to and investigating the Lighthouse Schemes. Google Decl. ¶¶ 41–42; *see* 18 U.S.C. § 1030(g); *id.* § 1030(c)(4)(A)(i)(I); *see also Saunders Ventures, Inc. v. Salem*, 797 F. App'x 568, 572–73 (2d Cir. 2019). For all these reasons, Google's CFAA claims are likely to succeed on the merits.

### C.    The Balance of Equities Decidedly Favors a Temporary Restraining Order.

The equities also favor a temporary restraining order. The Enterprise commits crimes, defrauds the public, and injures Google. There is no conceivable reason why it should be permitted to continue its illegal activities. *See, e.g.*, *Suber v. VVP Servs.*, 2021 WL 1101235, at *7 (S.D.N.Y. Mar. 23, 2021) (balance of hardships supported court's grant of an *ex parte* injunctive relief where the Enterprise did not "have any right to use the profits of a fraudulent enterprise … to continue supporting their unlawful activities or for personal uses"); *FTC v. Verity Int'l, Ltd.*, 2000 WL 1805688, at *1 (S.D.N.Y. Dec. 8, 2000) (balance of equities weighs in favor of a temporary restraining order where the Enterprise's practices likely violate a federal statute). It is "axiomatic that an infringer ... cannot complain about the loss of ability" to continue infringing, *3M Co. v. CovCare, Inc.*, 537 F. Supp. 3d 385, 404 (E.D.N.Y. 2021) (quoting *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012)), and Defendants' misconduct poses "grave harm ... to [Google's] reputation and brand in the absence of an injunction." *Id.*[5]

---

[5] *See also Microsoft Corp. v. Does 1–2*, 2024 WL 1708328, at *11 (E.D. Va. Jan. 10, 2024) ("Defendants would not suffer any hardship because an injunction would only require them to

**D.      The Public Interest Favors a Temporary Restraining Order.**

Finally, a temporary restraining order would serve the public interest. The Lighthouse Enterprise has defrauded over a million victims, while using their ill-gotten funds to support other criminal schemes. *See* Compl. ¶ 73; Naxo Decl. ¶¶ 6, 34. With each day, Defendants' phishing operations deceive new victims. The public interest is served by enforcing statutes designed to protect the public—such as RICO, the Lanham Act, and the CFAA—and thwarting criminal activity with no legitimate justification whatsoever. *See, e.g.*, *CME Grp. Inc.*, 2019 WL 13252902, at *3; *Microsoft Corp.*, 2022 WL 18359421, at *5.

**II.     The Temporary Restraining Order Must Be *Ex Parte*.**

Rule 65 authorizes courts to enter a temporary restraining order *ex parte* when the moving party sets forth facts that show an immediate and irreparable injury and why notice should not be required. Fed. R. Civ. P. 65(b)(l). Under this rule, an order may be issued without prior oral or written notice if (1) "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant" before the adverse party can be heard and (2) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." *Id.* A temporary restraining order "may be ordered on an ex parte basis under subdivision (b) if the applicant makes a strong showing of the reasons why notice to the Defendants is likely to defeat effective relief." Fed. R. Civ. P. 65 committee notes to 2001 amendment. As such, even where specific notice could have been given to the adverse party, *ex parte* orders are proper when notice "appears to serve only to render fruitless further prosecution of the action." *In re Vuitton et Fils S.A.*, 606 F.2d 1, 5 (2d Cir. 1979) (per curiam).

---

cease engaging in illegal activities"), *R&R adopted*, 2024 WL 1708323 (E.D. Va. Jan. 30, 2024); *Microsoft Corp.*, 2022 WL 18359421, at *5.

Google has already set forth facts demonstrating immediate and irreparable harm. Advance notice should not be required here because if the Enterprise were notified of the relief Google is seeking before this Court issues a temporary restraining order, it would quickly dissipate the infrastructure (like Lighthouse and Telegram channels) and resources (like tutorial videos) supporting the Lighthouse phishing operation, *see* Google Decl. ¶ 45, which would prevent Google from disrupting the scheme. The effectiveness of the requested relief depends on the disruption efforts being implemented before Defendants know about them. Google Decl. ¶¶ 45–47.

In any event, Google does not presently know Defendants' identities because Defendants routinely deploy aliases and false identities in connection with their cybercrime; consequently, it cannot provide them with written or oral notice. Courts routinely grant *ex parte* relief in these circumstances. *See, e.g., Mirashi v. Doe*, 2025 WL 783353, at *5 (D.N.J. Mar. 12, 2025) (granting *ex parte* TRO against phishing scheme where "Plaintiff's attorney has certified that neither he nor Plaintiff knows the identi[t]y of the Hacker" and "alerting the Hacker … would likely prompt the Hacker to take more 'extreme measures' to 'conceal and dissipate the stolen Bitcoin'"); *Sapient Corp. v. Does 1–50*, 2018 WL 8221301, at *2 (N.D. Cal. Mar. 27, 2018) (in action to enjoin phishing scheme, "SapientRazorfish's request for *ex parte* relief is not the result of any lack of diligence on SapientRazorfish's part, but instead based on the nature of Defendants' unlawful conduct"). *Ex parte* relief is also routinely granted where, as here, defendants are engaged in technically sophisticated cybercrimes and are "likely to delete or to relocate" their harmful internet infrastructure, "destr[oy] or conceal[] ... other discoverable evidence" of misconduct, and "warn their associates engaged in such activities" if given "advance notice of th[e] action." *E.g., Sophos Ltd. v. Does 1–2*, 2020 WL 4722425, at *2 (E.D. Va. May 1, 2020); *see also Filipova v. Gezhong (7–21 Delivery)*, 2025 WL 2831148, at *3 (S.D.N.Y. Oct. 6, 2025) (granting *ex parte* relief where

"Defendants may easily and quickly transfer or modify e-commerce store registration data and content, … thereby thwarting Plaintiff's ability to obtain meaningful relief"); *Google LLC v. Starovikov, et al.*, No. 1:21-cv-10260 (S.D.N.Y. Dec. 7, 2021), ECF No. 8.

This case presents the same danger and requires immediate relief. The Enterprise's technological sophistication and ability to conceal operations pose a significant risk (if not certainty) that the phishing operation will adapt its operations to evade disruption if Google is required to find and give the Enterprise advance notice of the precise relief it seeks. Google Decl. ¶ 45. To ensure that the *ex parte* relief is strictly limited to "serving [its] underlying purpose" and no more, *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 439 (1974), if the proposed order is granted, Google will undertake extraordinary efforts to locate and provide actual notice to the Enterprise of the temporary restraining order and preliminary injunction hearing, and will attempt to effect service of the relevant papers immediately upon effectuation of the injunctive relief in the proposed order, and in no event fewer than five days before the preliminary injunction hearing (or such time as the Court may order).

## III. The Court Should Authorize Google to Serve Process by Alternative Means.

Google also requests permission to serve the Enterprise's members, who are believed to reside in China, by alternative means under Federal Rule of Civil Procedure 4(f)(3). Compl. ¶ 15; Naxo Decl. ¶ 22. Google requests authorization to serve the Enterprise through as many of the following methods as are available: (1) website publication and (2) email using any information Google receives through disruption efforts and from web-hosting companies provided in connection with domain names used in the Lighthouse phishing operation.

Courts have long authorized alternative service through a variety of methods, "including publication, ordinary mail, … and most recently, email." *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1016 (9th Cir. 2002). "It is well-settled that service by email on foreign defendants

meets this standard in an appropriate case." *Elsevier, Inc. v. Siew Yee Chew*, 287 F. Supp. 3d 374, 379 (S.D.N.Y. 2018). Here, service through website publication and electronic messages is likely to be the most accurate and viable means of notice and service for these foreign cybercriminal Defendants. Other courts have routinely authorized service by website publication and/or email or electronic messaging in similar circumstances. *See, e.g.*, *Sapient Corp.*, 2018 WL 8221301, at *1; *Microsoft Corp. v. Does 1–18*, 2014 WL 1338677, at *3 (E.D. Va. April 2, 2014). And including multiple means of alternative service reinforces its permissibility and effectiveness. *Marvici v. Roche Facilities Maint. LLC*, 2021 WL 5323748, at *4 (S.D.N.Y. Oct. 6, 2021). Google therefore respectfully requests that the Court authorize alternative service under Rule 4(f)(3) using the proposed methods.

## IV.     The All Writs Act Authorizes the Court to Direct Cooperation by Third Parties.

The Enterprise uses apps, domains, and web servers hosted by third parties to perpetrate its fraud against Google and the public. Google's proposed order, if entered by the Court, would direct these third-party registrars, web infrastructure companies, and web hosting providers to take down or suspend the infrastructure used by the Enterprise, thereby disrupting its schemes. Google Decl. ¶¶ 46–47. This relief would include the disruption of any IP addresses or domains that the Enterprise may use in the future to perpetrate the phishing operation that are currently unknown to Google or that do not currently exist. The All Writs Act provides that courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). This language empowers courts to issue orders to non-parties, and specifically, in "appropriate circumstances," to "persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice." *Makekau v. Hawaii*, 943 F.3d 1200, 1205 (9th Cir. 2019) (quoting *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 174 (1977)). Notably, this

jurisdiction may "encompass even those who have not taken any affirmative action to hinder justice." *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 413–14 (2d Cir. 2002) (cleaned up). This "grant of authority to enjoin and bind non-parties to an action" when "needed to preserve the court's ability to … enforce its decision" is "[a]n important feature of the All Writs Act." *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 338 (2d Cir. 1985).

To determine whether the writ requested is "necessary or appropriate" within the meaning of the Act, courts consider whether: (1) the writ "unreasonabl[y] burdens" the third party at issue; (2) the writ is "necessary" or "essential to the fulfillment of the purpose" of a court order; and (3) the third party is "so far removed from the underlying controversy that its assistance could not be permissibly compelled." *N.Y. Tel. Co.*, 434 U.S. at 172–78; *see also United Spinal Ass'n v. Bd. of Elections in City of N.Y.*, 2017 WL 8683672, at *5 (S.D.N.Y. Oct. 11, 2017), *R&R adopted*, 2018 WL 1582231 (Mar. 27, 2018).

The narrowly tailored relief Google requests satisfies these requirements. *First*, requiring these companies to suspend or take down the relevant infrastructure imposes minimal burdens. Just as a telephone company "regularly employs [pen register] devices without court order" for its own business purposes, *N.Y. Tel. Co.*, 434 U.S. at 174, domain registrars and web infrastructure companies routinely suspend, terminate, or transfer domain services in the ordinary course of business. *See Chegg, Inc. v. Doe*, 2023 WL 7392290, at *10 (N.D. Cal. Nov. 7, 2023). The same is true for the hosting companies that maintain the servers. *Second*, the writ requested is necessary to effectuate the proposed order, the purpose of which is to disrupt the Enterprise's operations and the criminal network that profits from its fraud. Just as the surveillance authorized in *New York Telephone* could not have been accomplished without the participation of the telephone company,

the reasonable cooperation of the third-party registrars is required to halt the Enterprise's operation of its scam. *See In re U.S. of Am. for an Ord. Authorizing an In-Progress Trace of Wire Commc'ns Over Tel. Facilities*, 616 F.2d 1122, 1129 (9th Cir. 1980). And *third*, the third parties that maintain this infrastructure are not "so far removed" from the underlying criminal activity that their assistance cannot reasonably be compelled. *See N.Y. Tel. Co.*, 434 U.S. at 174. They control the domains and servers that enable the Enterprise to perpetrate its crimes.

Consistent with these principles, district courts routinely invoke the All Writs Act to grant relief similar to the relief requested here. *See, e.g.*, *Microsoft Corp. v. Nady and Does 1–4*, No. 24-cv-02013 (E.D. Va. Nov. 13, 2024), ECF No. 16 at 10 (ordering domain registries to ensure that defendant cannot use domains to engage in phishing); *Microsoft Corp. v. John Does 1–2*, No. 24-cv-02719 (D.D.C. Sept. 25, 2024), ECF No. 12 at 9 (similar).[6] To protect the public from the serious threat posed by Lighthouse and the Enterprise, it is well within this Court's authority to order the takedown or transfer of the domains and servers specified in Appendix A to the Naxo Declaration and to authorize Google to seek additional intervention from the Court if additional entities associated with or domains used in connection with Lighthouse are identified.

## CONCLUSION

Google respectfully requests that this Court grant its motion for a temporary restraining order and an order to show cause why a preliminary injunction should not issue. Google further

---

[6] *Microsoft Corp. v. Does 1–2*, No. 17-cv-01224 (E.D. Va. Oct. 27, 2017), ECF No. 26 at 8 (ordering registries to prevent transfer or modification of the domains); *Microsoft Corp. v. Does 1–27*, No. 10-cv-00156 (E.D. Va. Feb. 22, 2010), ECF No. 13 at 3–4 (ordering registries to lock and remove domains); *Microsoft Corp. v. John Does 1–2*, No. 21-cv-00822 (E.D. Va. July 16, 2021), ECF No. 18 at 7 (ordering registries to take steps to prevent defendants from "accessing, modifying, transferring or using in any manner the domains").

requests that the Court permit notice of the preliminary injunction hearing and service of the complaint by alternative means.

Dated: November 12, 2025                Respectfully submitted,

                                        /s/ *Laura Harris*
                                        Laura Harris
                                        **KING & SPALDING LLP**
                                        1290 Avenue of the Americas, 14th Fl.
                                        New York, NY 10104-0101
                                        Tel: (212) 556-2100
                                        Fax: (212) 556-2222
                                        lharris@kslaw.com

                                        Christine M. Carletta
                                        **KING & SPALDING LLP**
                                        1700 Pennsylvania Ave., NW, Suite 900
                                        Washington, DC 20006-4707
                                        Tel: (202) 737-0500
                                        Fax: (202) 626-3737
                                        ccarletta@kslaw.com

                                        Sumon Dantiki (*pro hac vice* to be submitted)
                                        **BAKER MACKENZIE LLP**
                                        815 Connecticut Avenue, N.W.
                                        Washington, DC 20006
                                        Tel: (202) 452-7000
                                        Fax: (202) 452 7074
                                        sumon.dantiki@bakermckenzie.com

                                        *Counsel for Plaintiff Google LLC*

## CERTIFICATE OF COMPLIANCE

I, Laura Harris, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c), that the foregoing Google LLC's Memorandum of Law in Support of Its Motion for an *Ex Parte* Temporary Restraining Order and Order to Show Cause was prepared using Microsoft Word and contains 8,515 words in accordance with Local Rule 7.1(c).